United States District Court

For the Northern District of California

1

2

3

4

5            UNITED STATES DISTRICT COURT

6            NORTHERN DISTRICT OF CALIFORNIA

7

8   OCEANA, INC.,                          No. C-11-6257 EMC

9           Plaintiff,                     **ORDER GRANTING IN PART AND
                                           DENYING IN PART PLAINTIFF'S
10          v.                             MOTION FOR SUMMARY
                                           JUDGMENT, AND GRANTING IN
11  JOHN E. BRYSON, *et al.*,              PART AND DENYING IN PART
                                           DEFENDANTS' MOTIONS FOR
12          Defendants.                    SUMMARY JUDGMENT
    _____/
13
                                           **(Docket Nos. 40, 43-44)**
14

15                    I.    **INTRODUCTION**

16          Pending before the Court are cross motions for summary judgment filed by the Plaintiff, the

17  Federal Defendant and industry Intervenors.  This case arises under the Magnuson-Stevens Act,

18  which establishes Regional Fishery Management Councils, and requires those Councils to prepare

19  fishery management plans which are aimed at preventing overfishing.  Plaintiff challenges

20  Amendment 13, a 2010 amendment to the Costal Pelagic Species Fishery Management Plan, which

21  covers a number of species within the California Current Ecosystem.  Plaintiffs allege that

22  Amendment 13 fails to comply with various requirements of the Magnuson-Stevens Act ("MSA"),

23  and also violates the National Environmental Policy Act ("NEPA") and the Endangered Species Act

24  ("ESA").

25          For the reasons stated below, this Court concludes that many of the objections Plaintiff raises

26  under the MSA are untimely.  Of the timely objections, the Court finds that Amendment 13 violates

27  the MSA only in that it fails to specify a maximum sustainable yield proxy for the northern

28

1   subpopulation of the northern anchovy.  The Court additionally denies Plaintiff's motion for

2   summary judgment as to the NEPA and ESA claims.

3                    **II.   STATUTORY SCHEME & FACTUAL BACKGROUND**

4          Plaintiff brings suit to challenge Amendment 13 to the Coastal Pelegic Species Fishery

5   Management Plan ("CPS FMP," "the FMP" or "the plan"),[1] alleging that it is not in compliance with

6   the requirements of the Magnuson-Stevens Fishery Conservation and Management Act.

7   Specifically, Plaintiff alleges that Amendment 13 fails to set certain measures required by the MSA

8   (such as the "optimum yield" for the species of fish covered by the CPS FMP), that it fails to

9   appropriately account for certain known sources of uncertainty, and that it is not based upon the best

10  available science.  Plaintiff also alleges that Amendment 13 violates the National Environmental

11  Policy Act and the Endangered Species Act.

12  A.     Magnuson-Stevens Act Statutory Overview

13         Congress enacted the MSA, 16 U.S.C. §§ 1801, *et. seq.*,  in 1976 after finding that "[c]ertain

14  stocks of fish have declined to the point where their survival is threatened," and that "[a] national

15  program for the conservation and management of the fishery resources of the United States" had

16  become "necessary to prevent overfishing, to rebuild overfished stocks, to insure conservation, to

17  facilitate long-term protection of essential fish habitats, and to realize the full potential of the

18  Nation's fishery resources."  16 U.S.C. § 1801(a)(1), (7).  Its stated purposes are, *inter alia*, "to take

19  immediate action to conserve and manage the fishery resources found off the coasts of the United

20  States," and "to promote domestic commercial and recreational fishing under sound conservation

21  and management principles."  16 U.S.C. §§ 1801(b)(1), (3).

22         In order to carry out these purposes, the MSA established eight Regional Fishery

23  Management Councils, and directed each Council to:

24              prepare and submit to the Secretary [of Commerce] (A) a fishery
                management plan, and (B) amendments to each such plan that are
25              necessary from time to time (and promptly whenever changes in
                conservation and management measures in another fishery
26              substantially affect the fishery for which such plan was developed);

27  _____

28         [1]  A table of acronyms is attached as Exhibit A to this Order.

United States District Court

For the Northern District of California

1    16 U.S.C. § 1852 (h)(1).  The Pacific Council, whose fishery management plan is the subject of this

2    litigation, is the Council responsible for Pacific Ocean fisheries seaward of the states of California,

3    Oregon, and Washington.  16 U.S.C. § 1852(a)(1)(F).

4         Each Council is required to establish and maintain a scientific and statistical committee

5    ("SSC").  The role of the SSC is to assist the Council "in the development, collection, evaluation,

6    and peer review of such statistical, biological, economic, social, and other scientific information as is

7    relevant to such Council's development and amendment of any fishery management plan."  16

8    U.S.C. § 1852(g)(1)(A).  The Council may also set up additional advisory panels as it deems

9    necessary or appropriate.  *Id.* § 1852(g)(2).  Decisions and recommendations of the SSC are

10   generally considered advisory.  *Id.* § 1852(g)(5).

11   B.    Plan Implementation Process

12        Fishery management plans and their amendments are submitted by each Regional Fishery

13   Management Council to the Secretary of Commerce ("Secretary"), who reviews them to determine

14   whether proposed plans or amendments are consistent with the ten "national standards for fishery

15   conservation and management" listed in § 1851(a), the provisions of the Magnuson Act, and other

16   applicable law.  16 U.S.C. §§ 1851(a), 1854(a)(1)(A).  The Secretary must publish notice of a

17   Council's proposed plan or amendment in the Federal Register and solicit public comment.  *Id.* §§

18   1854(a)(1)(B); 1854(a)(5).  Within 30 days of the close of the public comment period, the Secretary

19   must either "approve, disapprove, or partially approve [the] plan or amendment . . . by written notice

20   to the Council." *Id.* § 1854(a)(3).  "If the Secretary does not notify a Council within 30 days of the

21   end of the comment period of the approval, disapproval, or partial approval of a plan or amendment,

22   then such plan or amendment shall take effect as if approved."  *Id.*

23        Fishery management plans, standing alone, "do not themselves have any regulatory effect –

24   implementing regulations must also be enacted in order to effectuate them."  *N.C. Fisheries Ass'n v.

25   Gutierrez*, 550 F.3d 16, 17 (D.C. Cir. 2008).  Thus, in addition to plans and their amendments, the

26   Act requires that the Council submit to the Secretary any "proposed regulations which the Council

27   deems necessary or appropriate for the purposes of . . . implementing a fishery management plan or

28   plan amendment" at the time that the Council submits the plan or amendment.  16 U.S.C. §

1   1853(c)(1).  Similar to the process for FMPs and their amendments, the MSA requires the Secretary

2   to "immediately initiate an evaluation of [a Council's] proposed regulations to determine whether

3   they are consistent with the fishery management plan, plan amendment, [the Magnuson Act], and

4   other applicable law."  16 U.S.C. § 1854(b)(1).  If the Secretary determines that the proposed

5   regulations are consistent, he must "publish such regulations in the Federal Register . . .  for a public

6   comment period of 15 to 60 days."  *Id.* § 1854(b)(1)(A).  "The Secretary shall promulgate final

7   regulations within 30 days after the end of the comment period."  *Id.* § 1854(b)(3).

8         The Secretary has delegated her authorities under the MSA to the National Marine Fisheries

9   Service ("NMFS"), a subagency of the National Oceanic and Atmospheric Administration

10  ("NOAA") within the Department of Commerce.  *Fishermen's Finest, Inc. v. Locke*, 593 F.3d 886,

11  889 (9th Cir. 2010).

12        Under certain limited circumstances, the Secretary may prepare her own FMP or amendment

13  if the Council fails to develop and submit an FMP or necessary amendment to the Secretary within a

14  "reasonable" period of time.  16 U.S.C. § 1854(c)(1).  Similarly, if the Secretary disapproves or

15  partially disapproves an FMP or amendment, and the Council fails to submit a revised plan, the

16  Secretary may prepare her own plan or amendment.  *Id.*

17  C.    <u>Required Contents of Fishery Management Plans</u>

18        The Magnuson Act requires that fishery management plans and plan amendments adhere to a

19  number of standards, and provides specific guidelines for the required contents of plans.  Section

20  1853 sets forth the provisions that FMPs must include.  A number of the required provisions are

21  relevant to the dispute in this case.

22        First, §1853(a)(1)(A) requires plans to "contain the conservation and management measures"

23  which are "necessary and appropriate for the conservation and management of the fishery, to prevent

24  overfishing and rebuild overfished stocks, and to protect, restore, and promote the long-term health

25  and stability of the fishery."  The Act defines "overfishing" as the "rate or level of fishing mortality

26  that jeopardizes the capacity of a fishery to produce the maximum sustainable yield on a continuing

27  basis."  16 U.S.C. § 1802(34).  NMFS has, in turn, defined maximum sustainable yield ("MSY") as

28  "the largest long-term average catch or yield that can be taken from a stock or stock complex under

1  prevailing ecological, environmental conditions and fishery technological characteristics . . . and the

2  distribution of catch among fleets." 50 C.F.R. § 600.310(e)(1)(i)(A).

3       Second, §1853 (a)(1)(c) requires the conservation and management measures in FMPs to be

4  "consistent with the national standards, the other provisions of this chapter, . . . and any other

5  applicable law." The "national standards" are ten standards for fishery conservation and

6  management that Congress mandated all plans and implementing regulations adhere to, which are

7  codified at 16 U.S.C. § 1851(a). The relevant national standards are discussed in more detail below.

8       Third, the Magnuson Act mandates that fishery management plans "assess and specify . . .

9  the maximum sustainable yield and optimum yield from[] the fishery, and include a summary of the

10 information utilized in making such specification." 16 U.S.C. § 1853(a)(3); 50 C.F.R. § 600.310

11 (e)(3)(i)(A). Optimum yield ("OY") is defined to mean the amount of fish that "will provide the

12 greatest overall benefit to the Nation, particularly with respect to food production and recreational

13 opportunities, and taking into account the protection of marine ecosystems." 16 U.S.C. § 1802(33).

14 OY is to be "prescribed on the basis of the maximum sustainable yield from the fishery, as reduced

15 by any relevant social, economic, or ecological factor." *Id.*

16      Finally, the Act requires plans to "specify objective and measurable criteria for identifying

17 when the fishery to which the plan applies is overfished," and, "in the case of a fishery which the

18 Council or the Secretary has determined is approaching an overfished condition or is overfished,

19 contain conservation and management measures to prevent overfishing or end overfishing and

20 rebuild the fishery." 16 U.S.C. § 1853(a)(10).

21 D.   <u>National Standards 1 and 2</u>

22      As noted above, § 1853(a)(1)(c) requires that FMPs contain conservation and management

23 measures that are consistent with natural standards. The instant suit implicates National Standards 1

24 and 2 and the related advisory guidelines. National Standard 1 provides that "[c]onservation and

25 management measures shall prevent *overfishing* while achieving, on a continuing basis, the *optimum*

26 *yield* from each fishery for the United States fishing industry." 16 U.S.C. § 1851(a)(1) (emphasis

27 added). The guidelines note that "[t]he determination of [optimum yield] is a decisional mechanism

28 for resolving the [Magnuson Act]'s conservation and management objectives, achieving a fishery

United States District Court

For the Northern District of California

1   management plan's [] objectives, and balancing the various interests that comprise the greatest

2   overall benefits to the Nation."  50 C.F.R. § 600.310(b)(2)(ii).

3            Thus, under National Standard 1 and NMFS' implementing regulations, a plan must include

4   conservation and management measures that both prevent *overfishing* (a rate of fishing which would

5   jeopardize the capacity of a fishery to produce the maximum sustainable yield on a continuing

6   basis), and achieve *optimum yield* (the maximum sustainable yield from the fishery as reduced by

7   any relevant social, economic, or ecological factor).

8            National Standard 2 provides that "[c]onservation and management measures shall be based

9   upon the best scientific information available."  16 U.S.C. § 1851(a)(2).  Following this standard,

10  fishery management plans "must take into account the best scientific information available at the

11  time of preparation."  50 C.F.R. § 600.315(b)(2).

12           The MSA provides that the Secretary shall establish guidelines based on the national

13  standards, but provides that these "shall not have the force and effect of law."  16 U.S.C. § 1851(b).

14  These standards, found at 50 C.F.R. § 600.305-600.355, define and explicate a number of the terms

15  in the statute, including optimum yield, maximum sustainable yield, minimum stock size threshold,

16  and acceptable biological catch.  *See* 50 C.F.R. § 600.310.

17  E.       Magnuson-Stevens Fishery Conservation and Management Reauthorization Act

18           In January 2007, Congress enacted the Magnuson-Stevens Fishery Conservation and

19  Management Reauthorization Act of 2006 ("MSRA"), P.L. 109-479, 120 Stat. 3575 (2007), which

20  imposed additional requirements for fishery management plans intended to strengthen the role of

21  science and account for uncertainty in fishery management.  *See* S. Rep. 109-229 (April 4, 2006) at

22  3-8.  The MSRA, in relevant part, required that each fishery management plan also "establish a

23  mechanism for specifying annual catch limits in the plan . . . at a level such that overfishing does not

24  occur in the fishery, including measures to ensure accountability."  16 U.S.C. § 1853(a)(15).  This

25  new requirement "shall . . . take effect" in 2011 for stocks (including those at issue in this case) that

26  are not subject to overfishing.  P.L. 109-479, § 104(b)(1).  The MSRA also directs each Council to

27  "develop annual catch limits for each of its managed fisheries that may not exceed the fishing level

28  recommendations of its scientific and statistical committee . . ."  16 U.S.C. § 1852(h)(6).

6

In 2009, NMFS promulgated regulations pursuant to the MSRA.  NMFS's implementing guidelines instruct Councils to establish annual catch limits ("ACLs") in relation to the overfishing limit ("OFL"), which is a quantifiable factor "used determine if overfishing has occurred, or if the stock or stock complex [of a fishery] is overfished."  50 C.F.R. § 600.310(e)(2)(i)(A).  The OFL "is an estimate of the catch level above which overfishing is occurring."  50 C.F.R. § 600.310(e)(2)(i)(D).  The guidelines clarify that "overfishing" is distinct from "overfished."  A fishery stock "is considered 'overfished' when its biomass has declined below a level that jeopardizes the capacity of the stock . . . to produce MSY on a continuing basis."  50 C.F.R. § 600.310(e)(2)(i)(E).  "'[O]verfished' relates to biomass of a stock . . . , and 'overfishing' pertains to a rate or level of removal of fish from a stock."  *Id.* § 600.310(e)(2)(i)(A).  The level of biomass below which a fish stock is considered to be overfished is referred to as the minimum stock size threshold ("MSST").  *Id.* § 600.310(e)(2)(i)(F).

In order to control for scientific uncertainty in identifying the overfishing limit, the guidelines require Councils to specify an "acceptable biological catch" level ("ABC"), which is defined as "a level of a stock or stock complex's annual catch that accounts for the scientific uncertainty in the estimate of OFL and any other scientific uncertainty."  50 C.F.R. § 600.310(f)(2)(ii).  By taking into account scientific uncertainty, the "acceptable biological catch" level for a particular fishery is likely to be more conservative than the overfishing level for that same fishery.  *See* 50 C.F.R. § 600.310(f)(3) ("While the ABC is allowed to equal OFL, NMFS expects that in most cases ABC will be reduced from OFL to reduce the probability that overfishing might occur in a year.").  Generally, when a Council sets an annual catch limit in a fishery management plan, the "ACL cannot exceed the ABC."  50 C.F.R. § 600.310(f)(5)(i).  *See also id.* ("If a Council recommends an ACL which equals ABC, and the ABC is equal to OFL, the Secretary may presume that the proposal would not prevent overfishing, in the absence of sufficient analysis and justification for the approach.").  The guidelines require Councils to "evaluate and describe" these metrics "in their [plans] and amend the [plans], if necessary, to align their management objectives to end or prevent overfishing" for "all stocks and stock complexes" considered to be located "in the fishery."  50 C.F.R. § 600.310(c).

United States District Court

For the Northern District of California

F.      Coastal Pelagic Species FMP

The fishery management plan that is the subject of this lawsuit originated as an FMP concerned solely with the northern anchovy in 1977.  AR 13746.  This plan was approved and published in the Federal Register in 1978.  *Id.*  Since that time, the plan has been amended numerous times.  AR 13746-47.  Two amendments are particularly relevant to this case: Amendment 8, which was implemented on January 1, 2000, and Amendment 10, which was implemented on January 27, 2003.  AR 13747.

Amendment 8 updated the FMP to comply with recent amendments to the MSA, and expanded the FMP to cover not just the northern anchovy, but also the Pacific sardine, the Pacific (chub) mackerel, jack mackerel, and market squid.  AR 13747.  These species are all pelagic, meaning they live in the water column as opposed to near the sea floor.  AR 13594.  The species covered by the FMP are all considered to be forage species, that is, they are important to the marine ecosystem as food for predators.  AR 3251, 3329.  The predators that feed upon the species covered by the CPS FMP include a number of fish, marine mammals, and birds.  *Id.*  Some of these predators are classified as endangered or threatened under the Endangered Species Act.  AR 3329.  The parties vigorously dispute whether any of the fish populations covered by the FMP are currently overfished, subject to overfishing, or vulnerable to overfishing.[2]  *See* Pl.'s Mot. at 4; Fed. Def.'s Mot. at 8; Int. Def.'s Mot. at 4-6; Pl.'s Reply at 4-7; Int. Def.'s Opp. at 4-7.[3]

---

[2]  While the parties spend considerable time disputing the science on these points, whether these populations of fish are actually currently overfished is of minimal relevance to the questions of statutory compliance Plaintiff raises.  As such, rather than summarize the facts relevant to this dispute in depth here, this order considers them only where relevant to the analysis below.

[3]  On January 30, 2013, Defendant-Intervenor filed a motion for leave to file an errata sheet correcting certain data in their motion for summary judgment and opposition to Plaintiff's motion.  Defendant-Intervenor claims that these changes are not substantive, and that the errors were discovered when their consultant, Richard Parrish, was reviewing the filings in preparation for the February 14, 2013 hearing on this motion.  Docket No. 58.  Plaintiff opposes Defendant-Intervenor's request, contesting the accuracy of the figures, arguing that they raise new data rather than simply correcting errors, and objecting to opinions contained in the accompanying declaration of Richard Parrish.  Docket No. 59.  Plaintiff also contends that the proposed errata concern matters not central to this case, but request that if this Court allows Defendant-Intervenor's request, that Plaintiff be given a chance to respond.

As the numbers in question do not affect the analysis in this motion in any way, Defendant-Intervenor's request is **DENIED**.

Amendment 8 divided the species covered by the FMP into two categories: actively managed stocks, and monitored stocks. AR 3195. The "active" category was designated "for stocks and fisheries with biologically significant levels of catch, or biological or socioeconomic considerations requiring relatively intense harvest management procedures." *Id.* Actively managed species would be subject to periodic stock assessments and periodic adjustments of target harvest levels based on MSY control rules. *Id.* The "monitored" category was designated for "stocks and fisheries not requiring intensive harvest management and where monitoring of landings and available abundance indices are considered sufficient to manage the stock." *Id.* Monitored species would be subject to tracking of "trends in landings and qualitative comparison to available abundance data" but would not be subject to stock assessments or periodic adjustments to target harvest levels. *Id.* Only actively managed species were required to have explicit MSY control rules, definitions of overfishing, and overfished stocks; monitored species could use "'generic' or general definitions of overfishing and overfished stocks that do not have specific fishing mortality or biomass cut offs." *Id.* The actively managed species identified in the plan were the Pacific sardine and the Pacific mackerel, and the monitored species were the jack mackerel, northern anchovy, and market squid. AR 3419, 3429, 3431.

Amendment 8 set a "general MSY control rule" for actively managed stocks. AR 3220. This rule set the relationship between the harvest target level, the CUTOFF (the lowest level of estimated biomass at which directed harvest is allowed), the BIOMASS (estimated biomass of fish at 1+ years of age), and the FRACTION (the fraction of biomass above cutoff that can be taken by the fishery). AR 3220. Amendment 8 sets this rule as

$$H = (BIOMASS - CUTOFF) \times FRACTION$$

*Id.* Though this equation would set a harvest target level, the fishery would not automatically close when the harvest target level was reached. AR 3225-26. Amendment 8 also provides that harvest levels should be prorated to reflect estimates of the percentage of biomass in U.S., rather than Canadian or Mexican, waters. AR3220.

Amendment 8 did not explicitly define optimum yield as a set number for the species in the fishery, but defined OY "to be the level of harvest which is less than or equal to acceptable

biological catch (ABC) estimated using a MSY control rule, consistent with the goals and objectives of this fishery management plan (FMP), and used by the Council to manage the stock."  AR 3218.

Amendment 10 made changes to various permitting rules, and set the harvest guidelines for market squid.  *Id.*  Additional details about these amendments are provided where relevant to the analysis below.

G.      Development of Amendment 13 to the Coastal Pelagic Species FMP

NMFS published the final rule implementing the revised guidelines under the MSRA in January 2009.  74 Fed. Reg. 3178-3213.  In March 2009, the Council began preparations for Amendment 13.  AR 3614.  The Council noted that "[t]he MSRA and amended NMFS guidelines introduce new fishery management concepts including overfishing levels (OFLs), annual catch limits (ACLs), annual catch targets (ACTs), and accountability measures (AMs) that are designed to better account for scientific and management uncertainty and to prevent and end overfishing," and recognized a 2011 deadline for compliance with the new requirements.  *Id.*  At that time, the Council took action to "(1) Review final NMFS guidance on NS1 [National Standard 1]; (2) Discuss initial issues for CPS management and potential FMP amendment to meet the new NS1 guidelines; (3) Provide guidance on the scope and schedule for amending the CPS FMP."  AR 3615.  At the same time, an advisory subpanel identified additional changes to the FMP for the Council to consider during the amendment process; none of these suggested changes are related to the challenges brought in this suit.  AR 3706.

By February 2010, the Council had prepared a draft analyzing alternatives for incorporation into Amendment 13.  AR 4195.  This draft begins by summarizing changes made by the MSRA and revised guidelines, and commenting on the new requirements these changes impose on FMPs.  *Id.*  In discussing the scope of alternatives considered in the draft, the Council noted that "[l]egal requirements of the MSRA and the MSA combined with the policy guidance from NMFS on implementing [national standard 1] require the new provisions such as OFLs and ACLs be included in FMPs and management practices to end and prevent overfishing within a specific timeline."  AR 4197.  The draft considered various alternatives for each of several issues: (1) inclusion and classification of different species in the fishery; (2) setting status determination criteria; (3) setting

United States District Court
For the Northern District of California

10

United States District Court

For the Northern District of California

1   harvest control formulas for both actively managed and monitored species; (4) setting ACLs for

2   specific sectors of the fishing industry; (5) setting ACTs for actively managed and/or monitored

3   species; (6) transferring management of the species to the State of California.  AR 4197-4207.

4          The February 2010 draft explicitly rejected the possibility of a sweeping re-consideration of

5   status determination criteria such as MSY, MSST, ABC, and OY as those were currently set in the

6   CPS FMP.  The only two alternatives considered vis-a-vis status determination criteria were (1)

7   maintaining the status quo as to these criteria; and (2) maintaining the status quo but additionally

8   developing an MSY proxy for the northern subpopulation of the northern anchovy.  AR 4201.  The

9   Council noted that "[a]lthough the Council and the CPSMT have identified the review of some of

10  the existing SDCs as priority research needs, the process of reviewing and potentially revising the

11  existing SDCs is outside the scope and the allotted time of Amendment 13."  AR 4200.

12         In June 2010, the Council took final action to adopt Amendment 13, which was later

13  transmitted to NMFS along with proposed implementing regulations and an environmental

14  assessment in January 2011.  AR 12898.  In transmitting these materials, the Council indicated that

15  Amendment 13 brought the CPS FMP into compliance with the MSRA and the revised guidelines,

16  and identified the specific changes made by the plan.  AR 12898.  The changes identified were: (1)

17  categorizing all actively managed, monitored, and prohibited harvest species as "in the fishery" and

18  subjecting them to the new management provisions required by the MRSA and guidelines; (2)

19  maintaining existing status determination criteria, with the exception of those modified through the

20  annual harvest and management specification process; (3) adding jacksmelt and Pacific herring to

21  the FMP as ecosystem component species; (4) adding new buffer terms to existing harvest control

22  rules to account for scientific uncertainty; (5) modifying default harvest control rules for monitored

23  stocks to include new management reference points; (6) adding sector-specific ACLs, ACTs, and

24  AMs; and (7) adding language that specifies that the Council shall consider ecological factors in

25  developing status determination criteria, ACLs, and ACTs.  AR 12898-99.

26         The Council prepared an Environmental Assessment for Amendment 13.  The Environmental

27  Assessment discussed various options considered in the preparation of the amendment.  AR 13579.

28  These options differed across four variables:  (1) classification of stocks in the fishery; (2) status

United States District Court

For the Northern District of California

1    determination criteria; (3) reference points (identified as OFL, ABC, and ACL); and (4) annual catch

2    targets and accountability measures.  AR 13588.  As with the February 2010 draft discussing

3    alternatives, the Environmental Assessment discussed only two options with regards to status

4    determination criteria: maintaining existing status determination criteria ("SDC"), or maintaining

5    existing SDCs but adding an MSY proxy for the northern subpopulation of the northern anchovy.

6    AR 13588-90.

7           In June 2011, NMFS published notice of the availability of Amendment 13 and a request for

8    comments in the Federal Register.  AR 13498; 76 Fed. Reg. 33189, 33190 (June 8, 2011).  The

9    notice described the scope of the amendment as follows:

> The purpose of Amendment 13 is to amend the CPS FMP to ensure it is consistent with these revised advisory guidelines and to comply with the statute.  Specifically, Amendment 13 would revise the framework process to set and adjust fishery specification and management measures, and would establish a framework for specifying new reference points such as ACLs and AMs, as well as other provisions for preventing overfishing such as the potential setting of annual catch targets.
>
> Amendment 13 revises the framework process currently in place to set and adjust fishery specifications and management measures and establishes a framework for specifying new reference points such as overfishing level (OFL), acceptable biological catch (ABC) and ACL, where necessary.  This includes the mechanisms to set ACLs and the associated AMs to ensure they are not exceeded, control rules for determining ABC and other provisions for preventing overfishing such as the potential setting of annual catch targets (ACTs) and the development of Maximum Sustainable Yield proxies and/or OFLs for those stocks for which current biomass estimates are not available.  Specifically, Amendment 13 would implement this new fishery specification framework, designed to better account for scientific and management uncertainty and to prevent overfishing, in the FMP through the following:
>
> •    Modify the existing harvest control rules for actively managed species to include a buffer or reduction in ABC relative to OFL to account for scientific uncertainty.  This buffer will be determined during the annual management cycle through a combination of scientific advice from the Scientific and Statistical Committee (SSC) and a policy determination of the Council;
>
> •    Maintain the default harvest control rules for monitored stocks as modified to specify the new reference points.  ACLs would be specified for multiple years until such time as the species becomes actively managed or new scientific information becomes available. . . .

12

United States District Court

For the Northern District of California

- • Add a mechanism for the use of sector-specific ACLs, ACTs and AMs, in the annual harvest and management specification process.

*Id.*; *see also* AR 13748 (similar description of scope in introduction to Amendment 13).

Plaintiff and several other organizations submitted comments in response to this notice.  AR 13895.  In an internal memorandum accompanying the approval of Amendment 13, NMFS noted that:

> The majority of points raised in these three comments focused on changes the groups want to the existing FMP as opposed to any specific aspect of Amendment 13.  The comments request changes to the FMP such as revising status determination criteria, determining overfished criteria for those species for which minimum stock size thresholds are unknown and revising optimum yield and MSY calculations to more explicitly account for forage needs of the California Current.

AR 13895-96.  It does not appear that NMFS directly contacted Plaintiff or the other commenters to indicate that many of their comments were out of the scope of Amendment 13.  The final notice of Amendment 13's adoption in the Federal Register, however, notes that "[t]he majority of the points raised in the NGO comment related more to the CPS FMP as a whole as opposed to specific changes being made by Amendment 13, and will not be addressed here."  AR 13956.

The final regulations implementing Amendment 13 were published in the Federal Register on November 14, 2011.  AR 13956; 76 Fed. Reg. 70362 (Nov. 14, 2011).

H.    Contents of Amendment 13

Amendment 13, as proposed by the Council and finally approved, made significant changes to the harvest control rules set by Amendment 8.  Rather than Amendment 8's one harvest control formula for actively managed species, Amendment 13 sets several related formulas for determining different fishery management benchmarks such as harvest guidelines ("HG"), ABC, ACL, and ACT. AR 13778-79.  Amendment 13 sets forth the following relationships between the terms:

$$OFL = BIOMASS \times FMSY \times DISTRIBUTION$$

$$ABC = BIOMASS \times BUFFER \times FMSY \times DISTRIBUTION$$

$$ACL = \text{less than or equal to } ABC$$

13

1    HG = (BIOMASS - CUTOFF) x FRACTION x DISTRIBUTION

2    ACT = HG or ACL, whichever value is less where the terms have the

3    following definitions:

4    FMSY - the fishing rate corresponding to maximum sustainable yield

5    DISTRIBUTION - the average portion of biomass assumed to be in

6    U.S. waters

7    BUFFER - a figure set to account for scientific uncertainty

8  The harvest goal formula is essentially the same as the formula set by Amendment 8, but the others

9  are new to Amendment 13.[4]  *Compare* AR 13778-79 *with* AR 3412.  Amendment 13 provides that

10  "[i]f the HG, ACL, or ACT for the directed fishery is reached the directed fishery will be closed by

11  automatic action . . . ."  AR 13784.  Since the closure of the fishery is triggered by the *lowest* of

12  these values, actual harvest levels in the fishery will be either the same as under the previous version

13  of the FMP (when HG is the lowest value) or lower than previous levels (where ABC is the lowest

14  value).  Other differences and similarities between Amendment 13 and prior amendments to the

15  FMP will be discussed as relevant below.

16                         **III.**   **DISCUSSION**

17       Summary judgment is proper where the pleadings, discovery and affidavits show that there is

18  "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

19  law."  Fed. R. Civ. P. 56(a).  The Court will grant summary judgment "against a party who fails to

20  make a showing sufficient to establish the existence of an element essential to that party's case, and

21  on which that party will bear the burden of proof at trial ... since a complete failure of proof

22  concerning an essential element of the nonmoving party's case necessarily renders all other facts

23

---

24      [4]  The default harvest rule for actively managed species in Amendment 8 initially appears to

25  differ from the rule in Amendment 13 in that it lacks the DISTRIBUTION term. *See* AR 3220 (H =
(BIOMASS - CUTOFF) x FRACTION); AR 13779 (HG = (BIOMASS - CUTOFF) x FRACTION x

26  DISTRIBUTION).  Though distribution is not included in this formula in Amendment 8, however,
that amendment later provides that "the default approach in the CPS FMP sets harvest levels for

27  U.S. fisheries by prorating the total target harvest level according to the portion of the stock resident
in U.S. waters or estimating the biomass in U.S. waters only."  AR 3220.  Thus, as a practical

28  matter, it appears that distribution was taken into account in Amendment 8 in substantially the same
manner as in Amendment 13.

United States District Court

For the Northern District of California

1    immaterial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *see also Anderson v. Liberty*

2    *Lobby*, Inc., 477 U.S. 242, 248 (1986) (a fact is material if it might affect the outcome of the suit

3    under governing law, and a dispute about a material fact is genuine "if the evidence is such that a

4    reasonable jury could return a verdict for the nonmoving party."). The moving party bears the initial

5    burden of identifying those portions of the record which demonstrate the absence of a genuine issue

6    of material fact. The burden then shifts to the nonmoving party to "go beyond the pleadings and by

7    her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,'

8    designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324

9    (citations omitted). The Court's function on a summary judgment motion is not to make credibility

10   determinations or weigh conflicting evidence with respect to a disputed material fact. *See T.W. Elec.*

11   *Serv. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir.1987). The evidence must be

12   viewed in the light most favorable to the nonmoving party, and the inferences to be drawn from the

13   facts must be viewed in a light most favorable to the nonmoving party. *See id.* at 631.

14          Judicial review of claims under the MSA, ESA and NEPA is governed by the Administrative

15   Procedure Act (APA). 16 U.S.C. § 1855(f)(1); *Oregon Trollers Ass'n v. Gutierrez*, 452 F.3d 1104,

16   1116 (9th Cir. 2006) (MSA); *Karuk Tribe of California v. U.S. Forest Serv.*, 681 F.3d 1006, 1017

17   (9th Cir. 2012) (ESA); *Save the Peaks Coal. v. U.S. Forest Serv.*, 669 F.3d 1025, 1035 (9th Cir.

18   2012) (NEPA). A court must set aside agency actions under these statutes where such action is

19   "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or was taken

20   "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (D). Review under the

21   APA is deferential;

22          Agency action should be overturned only when the agency has relied
            on factors which Congress has not intended it to consider, entirely
23          failed to consider an important aspect of the problem, offered an
            explanation for its decision that runs counter to the evidence before the
24          agency, or is so implausible that it could not be ascribed to a
            difference in view or the product of agency expertise.
25

26   *Pac. Coast Fed'n of Fishermen's Ass'n, Inc. v. Nat'l Marine Fisheries Serv.*, 265 F.3d 1028, 1034

27   (9th Cir. 2001) (internal quotation marks and citations omitted). The question for the court, thus, is

28   whether the agency considered the relevant factors and articulated a rational connection between the

United States District Court

For the Northern District of California

1   facts in the record and the action taken.  *Id.*; *Midwater Trawlers Co-operative v. Dep't of Commerce*,

2   282 F.3d 710, 716 (9th Cir. 2002).  In a challenge to agency action, "summary judgment is an

3   appropriate mechanism for deciding the legal question of whether the agency could reasonably have

4   found the facts as it did" based on the administrative record.  *Occidental Eng'g Co. v. I.N.S.*, 753

5   F.2d 766, 770 (9th Cir. 1985).

6   A.       Magnuson-Stevens Fishery Conservation and Management Act

7           As a preliminary matter, Defendants argue that many of the violations Plaintiff alleges under

8   the MSA are not timely raised, because they were promulgated under Amendment 8 rather than

9   Amendment 13.  The MSA provides for judicial review of regulations promulgated by the Secretary,

10  or actions taken by the Secretary under regulations implementing an FMP, so long as the petition for

11  review is filed within 30 days of the date that the regulations are promulgated or the action is

12  published in the federal register.  16 U.S.C. § 1855(f).

13          While the Ninth Circuit does not appear to have addressed this issue, a number of courts

14  have held that plaintiffs may not use challenges to FMP amendments as a vehicle for raising

15  objections to provisions of the FMP that were previously implemented.  For example, the court in

16  *Connecticut v. Daley*, considered a timely challenge brought to an FMP amendment that actually

17  concerned a state-by-state quota system which had been established in earlier versions of the FMP.

18  53 F. Supp. 2d 147, 161-62 (D. Conn. 1999) *aff'd on other grounds sub nom. Connecticut v. U.S.*

19  *Dept. of Commerce*, 204 F.3d 413 (2d Cir. 2000).  As the administrative record was "clear that the

20  [challenged regulations] did not change the state-by-state quota system . . . there was no agency

21  action concerning the quota system that is capable of being challenged" in the suit.  *Id.* at 162.  *See*

22  *also Midwater Trawlers Co-op. v. Mosbacher*, 727 F. Supp. 12, 14 (D.D.C. 1989) (founding a

23  plaintiff's claims time barred where the "complaint technically challenges the 1989 total allowable

24  catch specifications, [but] plaintiff's real grievance is with the optimum yield set in 1984").[5]  The

25  _____

26          [5]  While the MSA currently allows a regulation to be challenged outside the 30 day
    limitations period through a timely challenge to action taken under the regulation, this was not the
27  case in 1989.  *See Oregon Trollers Ass'n v. Gutierrez*, 452 F.3d 1104, 1113 (9th Cir. 2006) (1990
    amendment to MSA allows challenge to be brought within 30 days of either promulgation of
28  regulation or action taken under regulation).

United States District Court

For the Northern District of California

1  court in *Texas Shrimp Ass'n v. Daley*, similarly found a challenge to an interim rule untimely when

2  it was aimed at a total allowable catch benchmark set in an earlier version of the FMP.

3  4:00CV20-RH, 2000 WL 35938412 (N.D. Fla. Apr. 12, 2000) *aff'd sub nom. Texas Shrimp Ass'n v.*

4  *Evans*, 273 F.3d 397 (11th Cir. 2001) (table).  The court held that:

> Plan amendments which are premised upon or retain a status quo do
> not equate to "promulgation" of a new status quo. Thus, even when a
> proposed amendment includes new limits which are contingent upon a
> previously-enacted status quo amount, only the new limits themselves,
> and not the status quo amount, are subject to timely challenge.

8  *Id.* at *3.

9      There are some exceptions to the 30 day statute of limitations.  Since 1990, the MSA has

10  allowed plaintiffs to challenge regulations after the 30 day period through a suit challenging an

11  action taken under the regulation.  *See Oregon Trollers Ass'n v. Gutierrez*, 452 F.3d 1104, 1113 (9th

12  Cir. 2006).  The parties do not allege that such an action has occurred here, however.

13      Additionally, the D.C. Circuit has held that a regulation may be challenged outside the

14  original 30 day limitations period if the agency reopens the issue by considering and re-adopting the

15  applicable provision.  Thus, "where an agency's actions show that it has not merely republished an

16  existing rule in order to propose minor changes to it, but has reconsidered the rule and decided to

17  keep it in effect, challenges to the rule are in order."  *Pub. Citizen v. Nuclear Regulatory Comm'n*,

18  901 F.2d 147, 150 (D.C. Cir. 1990).  "The doctrine only applies, however, where 'the entire

19  context,' . . . demonstrates that the agency 'ha[s] undertaken a *serious, substantive reconsideration*

20  of the [existing] rule.'"  *P & V Enterprises v. U.S. Army Corps of Engineers*, 516 F.3d 1021, 1024

21  (D.C. Cir. 2008) (quoting *Nat'l Mining Ass'n v. U.S. Dep't of Interior*, 70 F.3d 1345, 1352

22  (D.C.Cir.1995)) (emphasis added).

23      One of the factors courts consider in determining whether or not a reopening has occurred is

24  the language in the notice of proposed rulemaking.  *Nat'l Ass'n of Reversionary Prop. Owners v.*

25  *Surface Transp. Bd.*, 158 F.3d 135, 142 (D.C. Cir. 1998) [hereinafter *Reversionary Property*

26  *Owners*].  If a notice of proposed rulemaking "uses language that can reasonably be read as an

27  invitation to comment on portions the agency does not explicitly propose to change . . . a renewed

28  challenge to the underlying rule or policy will be allowed."  *Pub. Citizen*, 901 F.2d at 150.  In this

1   context, ambiguity in the wording of the notice "may also tilt toward a finding that the issue has

2   been reopened." *Reversionary Property Owners*, 158 F.3d at 142.  For example, in *Ass'n of Am.*

3   *Railroads v. I.C.C.*, the court found that the agency's language was ambiguous as to whether it

4   intended to reconsider an old rule, or simply promulgate a new rule on a related issue.  846 F.2d

5   1465, 1473 (D.C. Cir. 1988).  The notice of rule making, however, indicated an intention to

6   "harmonize" the various past decisions on the issue, and the court found that this could be read to

7   suggest "that the search for harmony might lead to a rethinking of old positions." *Id.*

8          On the other hand, inviting comments on one part of a broader scheme does not necessarily

9   open up the entire scheme to comment. *Reversionary Property Owners*, 158 F.3d at 142.  The mere

10  fact that two rules are related in some way does not necessarily mean that reconsidering one

11  necessarily reopens the other.  The D.C. Circuit has noted that

12              We can scarcely imagine any rulemaking that does not impact at least
               several rules that are not explicitly at issue in the rulemaking.
13              Permitting any affected rule to be reopened for purposes of judicial
               review by a rulemaking that does not directly concern that rule would
14              stretch the notion of "final agency action" beyond recognition . . . .

15  *Nat'l Min. Ass'n v. U.S. Dept. of Interior*, 70 F.3d 1345, 1351 (D.C. Cir. 1995).

16         Courts also look to an agency's response to comments in determining whether a reopening

17  has occurred.  Where an agency has responded to comments on an issue, this may be an indication

18  that the agency intended to reopen the issue. *See State of Ohio v. U.S. E.P.A.*, 838 F.2d 1325, 1328

19  (D.C. Cir. 1988) (finding reopening where "the agency requested comments only on new or changed

20  provisions[,] . . . explained the unchanged but republished portion of the regulation in the notice of

21  proposed rulemaking in general policy terms, . . . and responded to at least one comment aimed

22  directly at" the unchanged portion of the rule).  However, the reopening doctrine is not to be used as

23  "a license for bootstrap procedures by which petitioners can comment on matters other than those

24  actually at issue, goad an agency into a reply, and then sue on the grounds that the agency had

25  re-opened the issue." *Am. Iron & Steel Inst. v. U.S. E.P.A.*, 886 F.2d 390, 398 (D.C. Cir. 1989).

26         The Ninth Circuit has not addressed the question of whether the reopening doctrine is law in

27  this circuit.  However, at least two courts in the Ninth Circuit, including one in this District, have

28  followed the rule. *See Envtl. Prot. Info. Ctr. v. Pac. Lumber Co.*, 266 F. Supp. 2d 1101, 1122 (N.D.

United States District Court

For the Northern District of California

1   Cal. 2003) ("When 'an agency's actions show that it has not merely republished an existing rule . . .

2   but has reconsidered the rule and decided to keep it in effect, challenges to the rule are in order.'")

3   (omission in original) (quoting *Public Citizen*, 901 F.2d at 150); *SLPR, LLC v. U.S. Army Corps of*

4   *Engineers*, 06 CV 1327 MMA POR, 2011 WL 1648732 (S.D. Cal. May 2, 2011) ("Courts have

5   consistently held that the statute of limitations does not bar review of agency actions that reopen a

6   previously decided issue when the agency reaches the same decision at a subsequent proceeding.");

7   *see also Stinson Canning Co., Inc. v. Mosbacher*, 731 F. Supp. 32, 34 n.3 (D. Me. 1990) ("Under

8   settled administrative law doctrine, statute of limitations time periods are reopened when an agency

9   publishes an existing rule in the Federal Register and solicits comments on the rule, even if the

10  agency ultimately decides not to alter the rule.").

11      This Court follows other courts in this circuit as well as guidance from the decisions of the

12  D.C. Circuit and apply the reopening doctrine here.  Given the fact specific inquiry required by the

13  reopening doctrine, this Court will consider its application to each of the alleged MSA violations in

14  turn.

15      1.   Optimum Yield

16      Plaintiff argues that Amendment 13 violated the MSA in that it failed to set optimum yield

17  for any of the species covered by the plan.  The MSA requires that fishery management plans

18  "assess and specify . . . optimum yield [OY] from[] the fishery, and include a summary of the

19  information utilized in making such a specification."  16 U.S.C. § 1853(a)(3).  The MSA defines

20  optimum yield as the level of fish harvesting that "will provide the greatest overall benefit to the

21  Nation, particularly with respect to food production and recreational opportunities, and taking into

22  account the protection of marine ecosystems."  16 U.S.C. § 1802(33)(A).  The optimum yield is thus

23  equal to the maximum sustainable yield, "as reduced by any relevant social, economic, or ecological

24  factor."  *Id.* § 1802(33)(B).  Optimum yield is not a year-by-year number, but "a long-term average

25  amount of desired yield from a stock."  50 C.F.R. § 600.310(e)(3)(ii).  As such, it is distinct from

26  metrics like annual catch limit or annual catch target which are set on an annual basis.  *Cf.* 50 C.F.R.

27  § 600.310(f)(5)(i) (multi year plans "must include a mechanism for specifying ACLs for each year

28  with appropriate [accountability measures] to prevent overfishing").

19

1    Other than the general statements about the scope of Amendment 13, Plaintiff does not

2    identify anything in the record that indicates that the Federal Defendant considered revisiting the

3    rule on optimum yield set by Amendment 8.  In both Amendment 13 and Amendment 8, OY is

4    defined as " the level of harvest which is less than or equal to ABC."  AR 13776, 3220.  Amendment

5    13 does, however, change the definition of acceptable biological catch (ABC), upon which optimum

6    yield is based.  AR 13776, 3220.  Amendment 8 provides that ABC is based on "a MSY control

7    rule," which is set as

8              $H = (BIOMASS - CUTOFF) \times FRACTION.$

9    AR 3218, 3220.  In Amendment 13, however, ABC is re-defined:

10             $ABC = BIOMASS \times BUFFER \times FMSY \times DISTRIBUTION.$

11   AR 13779.  While the stated definition for OY has not changed, redefining an underlying term

12   which informs the calculation of the OY does, as a practical matter, affect the optimum yield

13   determination.

14   However, this change in the definition of ABC does not affect the fundamental flaws

15   Plaintiff identifies with the FMP's treatment of OY.  *See* Pl.'s Mot. at 11-16.  According to

16   Plaintiffs, the definition of OY in Amendment 13 fails to conform with the requirements of the MSA

17   in three ways.  First, Amendment 13 does not actually set OY, but rather provides a framework for

18   setting OY in the future.  Second, this framework takes as its starting point ABC rather than MSY.

19   Third, the framework provides no explicit metric for reducing OY based on social, economic, and

20   ecological factors as required by the MSA.  None of these flaws, however, were introduced by

21   Amendment 13.  All were present in Amendment 8.  None of these points were revisited in

22   connection with Amendment 13's treatment of the OY.

23   Further, the administrative record taken as a whole indicates that the Council and NMFS did

24   not intent to reopen the definition of OY.  The notice opening the comments period on Amendment

25   13 did not mention revisiting the rule on optimum yield.  AR 13498.  Neither does the introduction

26   to Amendment 13, AR 13748, the February 2010 draft of alternatives considered for Amendment 13,

27   AR 4197-4207, the Environmental Assessment's discussion of alternatives considered, AR 13588-

28   92, or the memorandum approving Amendment 13.  AR 13790-95.  Moreover, the NMFS did not

1    respond to comments submitted on the question of OY, other than to note that they were beyond the

2    scope of Amendment 13.  AR 13895-96, 13956.  Thus, there is no indication that the NMFS

3    undertook a "serious, substantive recommendation" of the OY.  *P&V Enterprises*, 516 F.3d at 1024.

4    The agency did not reopen the treatment of the OY challenged herein which were extant in

5    Amendment 8.

6           Plaintiff points to *Flaherty v. Bryson*, arguing that this case holds that NMFS has a duty to

7    ensure that FMP amendments comply with all provisions of the MSA, regardless of concerns of

8    timeliness or reopening.  850 F. Supp. 2d 38 (D.D.C. 2012).  In *Flaherty*, NMFS had published a

9    notice of intent indicating that the Council would be preparing Amendment 4 to the Atlantic Herring

10   FMP in order to comply with the new requirements under the MSRA.  *Id.* at 45.  In addition, the

11   notice of intent stated that Amendment 4 might address several other issues, including improvement

12   of bycatch monitoring, and inclusion of protections for the river herring as well as the Atlantic

13   herring.  *Id.* at 46.  Subsequently, NMFS and the Council decided to focus only on complying with

14   the MSRA's requirements for the Atlantic herring, leaving the other provisions for consideration in

15   future amendments.  *Id.*  The *Flaherty* court ultimately found, *inter alia*, that (1) NMFS had acted

16   arbitrarily and capriciously in failing to conduct a meaningful review of the Council's decision not

17   to include the river herring in the FMP; and (2) NMFS had violated the MSA by approving

18   Amendment 4 without addressing how the amendment would minimize bycatch to the extent

19   practicable, as is required by the MSA.  *Id.* at 56, 59.

20          In *Flaherty*, however, there is no indication that any party challenged the timeliness of the

21   plaintiff's suit; the court does not address timeliness or the reopening doctrine at all.  In that case,

22   NMFS specifically invited comments on the aspects of the FMP that the plaintiff ultimately

23   challenged by including them in the notice of intent.  *Id.* at 46.  Though the court at one point notes

24   that the MSA includes "a clear Congressional statutory command . . . that NMFS shall review FMP

25   amendments for compliance with all provisions of the MSA," it does so in rejecting NMFS's

26   argument that the agency should defer to the Council on determinations of which fish should be

27   included under the FMP.  *Id.* at 55.  Thus, *Flaherty* does not support Plaintiff's position that this

28   Court should review all aspects of the FMP for compliance with the MSA regardless of whether they

United States District Court

For the Northern District of California

1    were reopened with Amendment 13.  In that case, it appears that the NMFS had taken steps to

2    reopen the matter at issue.  Further, Plaintiff's argument on this front would completely eviscerate

3    the clear statute of limitations provided in the MSA.  16 U.S.C. § 1855(f).  Congress' intent to limit

4    judicial review to actions initiated within 30 days of the promulgation of regulations or publication

5    of action would be undermined if every subsequent agency action or amendment to the FMP

6    provided the opportunity to challenge any and all sections of the FMP.  *See Nat'l Min. Ass'n*, 70

7    F.3d at 1351.[6]

8         Plaintiff's challenge to Amendment 13's method for specifying OY concern problems first

9    introduced by Amendment 8.  The putative problem with Amendment 8 was not changed in any

10   meaningful way in Amendment 13.  That aspect of Amendment 8 was not reopened or reconsidered

11   by the NMFS in issuing Amendment 13.  Thus, Plaintiff's challenge to Amendment 13's failure to

12   specify OY is untimely.  With regard to this issue, Plaintiff's motion for summary judgment is

13   **DENIED**, and Defendant's motions for summary judgment are **GRANTED**.

14        2.    Maximum Sustainable Yield for the Northern Anchovy Subpopulation

15             a.    Timeliness

16        Plaintiff argues that Amendment 13 fails to comply with the MSA in that it does not set a

17   value for maximum sustainable yield for the northern subpopulation of the northern anchovy. While

18   Amendment 8 also failed to include an MSY for the northern subpopulation of the northern anchovy,

19   it appears that Federal Defendant gave serious consideration of remedying this situation in

20   Amendment 13.  For example, the August 2011 Environmental Assessment for Amendment 13

21   discusses a variety of alternatives for amending the status determination criteria in the FMP.  AR

22   13588-92.  Several of the proposed alternatives would have developed an MSY for the northern

23   subpopulation of the northern anchovy.  *Id.*  In fact, the alternative identified as preferred by the

24   _____

25        [6]  The Court notes, however, that barring Plaintiff's challenge on this issue as untimely does
     not entirely insulate this portion of the CPS FMP from judicial review until such time as the
26   Council decides to revisit the definition of OY.  For example, Plaintiff may raise its concerns about
     failure to set OY through a petition for rulemaking, or by challenging an action taken under the
27   current plan.  *See* 16 U.S.C. § 1855(f); *Weight Watchers Int'l, Inc. v. F.T.C.*, 47 F.3d 990, 992 (9th
     Cir. 1995) ("An agency's denial of a petition for rulemaking constitutes final, reviewable agency
28   action, except where there is evidence of a clear and convincing legislative intent to negate review.")
     (internal citations omitted).

**United States District Court**
For the Northern District of California

1   Council includes developing an MSY for this population.  AR at 13590.  The introduction to

2   Amendment 13, however, notes that the amendment does not include an MSY for the northern

3   subpopulation of the northern anchovy because "no criteria currently exist."  AR 13749.

4        From the record, it would thus appear that the Council explicitly considered specifying an

5   MSY for the northern subpopulation of the northern anchovy, but decided not to do so because of

6   concerns about the adequacy of the data on this species.  This explicit consideration is sufficient to

7   bring this issue within the reopening doctrine.  Plaintiff's challenge on this issue is thus not time

8   barred.

9            b.   Merits

10       Amendment 13 does not specify an MSY for the northern subpopulation of the northern

11  anchovy, noting that the portion of the subpopulation in U.S. waters was unknown.  AR 13781-82.

12  The Federal Defendant argues that it lacked sufficient data to determine MSY for this population,

13  and that the MSA does not require setting an MSY under such circumstances.

14       The MSA requires FMPs to "assess and specify the . . . maximum sustainable yield . . .

15  from[] the fishery, and include a summary of the information utilized in making such specification."

16  16 U.S.C. § 1853(a)(3).  The regulations implementing the MSA recognize, however, that Councils

17  may not always have at their disposal adequate data to set an MSY for a given stock of fish.  The

18  regulations provide, that "[w]hen data are insufficient to estimate MSY directly, Councils should

19  adopt other measures of reproductive potential, based on the best scientific information available,

20  that can serve as reasonable proxies for MSY."  50 C.F.R. § 600.310(e)(1)(iv).  Citing to the MSA's

21  requirement that conservation measures be based upon "the best scientific information available," 16

22  U.S.C. § 1851(a)(2), the regulations elsewhere note that "[w]hen data are insufficient to estimate

23  reference points directly, Councils should develop reasonable proxies *to the extent possible*."  50

24  C.F.R. § 600.310(l) (emphasis added).

25       Amendment 13 contemplates that MSY for the northern subpopulation of the northern

26  anchovy will be set at a future point.  It provides that "[a]ppropriate [status determination criteria]

27  and biological reference points (if determined), and harvest specifications . . . are developed and

28  adopted under the annual specification cycle and recorded in the CPS [Stock Assessment and

**United States District Court**
For the Northern District of California

1    Fishery Evaluation report].” AR 13782. It does not, however, contain any further explanation of

2    why there is insufficient data to set and MSY. *Id.* Amendment 8, which had also not specified an

3    MSY for this population of fish, discussed various studies that attempted to estimate the biomass of

4    the population, but expressed concerns about the reliability of the data. AR 3432. The Council thus

5    “recommended [that] studies currently underway to estimated [sic] biomass and productivity be

6    continued.” *Id.*

7         Federal Defendant points to a November 2010 report prepared by the Council’s CPS

8    management team, which discusses the lack of data around the northern subpopulation of the

9    northern anchovy. AR 16641. The report noted that the Management Team

10                  is unable to determine an MSY proxy (equal to OFL for monitored
                    CPS stocks) for the [northern subpopulation of the northern anchovy]
11                  because of the extremely limited information about current biomass or
                    the variability of biomass over time. Therefore, the [management
12                  team] does not recommend a specific OFL/MSY proxy at this time.

13   *Id.* This report does, however, suggest two potential numbers to consider for use as the OFL, both of

14   which “are reasonable, based on the biology of the species, results of the vulnerability analysis for

15   CPS stocks in the California Current ecosystem . . . . the relatively low recent catch for this

16   subpopulation, and consistency with other CPS-monitored stock benchmarks.” *Id.* The first number

17   would set the MSY/OFL proxy at 26,000 mt, based on biomass estimates in unpublished studies

18   from the mid-1970s and 2008. *Id.* The second number would set the MSY/OFL proxy at 12,000 mt,

19   based on recent catch numbers. AR 16642.

20        Also in November 2010, the CPS scientific and statistical committee prepared

21   recommendations for 2011 management measures for the fishery. AR 16652. The

22   recommendations noted that reference points for all of the monitored species covered by the FMP

23   are difficult to determine due to limited data to estimate biomass and productivity.” AR 16653. In

24   particular, the recommendations noted the lack of reliable data on the northern subpopulation of the

25   northern anchovy. *Id.* The scientific and statistical committee surveyed the limited available data,

26   and recommended an OFL value based on the average of biomass figures from the two available

27   studies, multiplied by the FMSY for Pacific mackerel, because “anchovy are likely to be as

28   productive as Pacific mackerel.” *Id.* The SSC then applied the 75% uncertainty buffer used for all

United States District Court
For the Northern District of California

1   monitored species under the FMP, yielding a recommended OFL of 39,000 mt and an ABC of 9,750

2   mt.[7]  *Id.*

3          Federal Defendant argues that the recommendation of the SSC on this issue came too late for

4   incorporation into Amendment 13.  The Federal Defendant points out that the Council took final

5   action approving the proposed amendment in June 2010.  AR 12898.  The Council sent the proposed

6   Amendment 13 to NMFS for approval in January 2011, along with the implementing regulations and

7   draft environmental assessment required by the National Environmental Policy Act.  *Id.*  While the

8   Federal Defendant does not explicitly so state, this suggests that the Council was using the second

9   half of 2010 to prepare the regulations and environmental assessment based on the June 2010

10  version of Amendment 13.  The fact that the SSC had identified an OFL/MSY proxy before the

11  Council transmitted the draft of Amendment 13 to NMFS does raise the question of why this figure

12  was not included in Amendment 13.  Further, NMFS did not publish the notice of availability and

13  request for comments on Amendment 13 in the Federal Register until June 8, 2011.  AR 13497.  The

14  final implementing regulations for Amendment 13 were published on November 14, 2011, a year

15  after the SSC arrived at a recommended MSY proxy.  AR 13956.

16         The guidelines for National Standard 2 specifically consider the possibility that information

17  may becomes available after the Council has drafted a fishery management plan:

18              Between the initial drafting of an FMP and its submission for final
                review, new information often becomes available. This new
19              information should be incorporated into the final FMP where
                practicable; but it is unnecessary to start the FMP process over again,
20              unless the information indicates that drastic changes have occurred in
                the fishery that might require revision of the management objectives or
21              measures.

22  50 C.F.R. § 600.315(b)(2).  Relying on this provision, the Ninth Circuit has held that a Council was

23  not arbitrary and capricious in failing to consider data that only became available in raw form one

24  month prior to the Council issued recommendations that were the culmination of a two year process.

25  *Fishermen's Finest, Inc. v. Locke*, 593 F.3d 886, 897 (9th Cir. 2010).  The court held that "[g]iven

26

27         [7]  At the hearing on these motions, Plaintiff indicated that it felt this figure was not an
28  acceptable MSY proxy as required by the MSA.  Plaintiff's concerns about the adequacy of this
    figure, however, are not currently before this Court.

United States District Court
For the Northern District of California

1    the time needed to process the information, and the fact that the Council's deliberations were coming

2    to a close after more than two years, incorporating the new information was not "practicable" and so

3    need not have been considered under National Standard 2." *Id.* at 897-98.

4         In this case, the new MSY recommendation became available several months after the

5    Council had taken its final action on Amendment 13, but before the Council transmitted the draft of

6    the amendment to NMFS.  This is even later than was the case in *Fishermen's Finest*, suggesting

7    that Defendant has raised a plausible argument that incorporating the information was not

8    "practicable."  On the other hand, the late-available information in *Fishermen's Finest* was raw,

9    unprocessed data that would have taken a considerable amount of time to process and incorporate.

10   Here, the suggested MSY was one number.  Defendants point to nothing in the record suggesting

11   that it would have caused significant disruption to add the MSY estimate and a short justification in

12   the amendment before transmitting it to NMFS.  Defendants have offered no explanation for why it

13   was not "practicable" to incorporate this number into Amendment 13 before the Council transmitted

14   it to NMFS in January 2011, or before the notice of proposed rulemaking was published in June

15   2011.  They merely note that by the time the number was available, the Council had taken its final

16   action approving Amendment 13.  Given the timeline of actions here, this fact, without further

17   explanation, does not convincingly establish that it was not possible to incorporate the MSY proxy

18   for the northern subpopulation of the northern anchovy into Amendment 13 at some point before the

19   amendment was finalized.  Without such an explanation, NMFS's decision to approve Amendment

20   13 without an MSY proxy for this population was arbitrary, capricious, and contrary to law.

21        Accordingly, on this issue, Plaintiff's motion for summary judgment is **GRANTED**, and

22   Defendant's motions for summary judgment are **DENIED**.

23        3.    Consideration of Uncertainty in Calculating ABC

24              a.    Timeliness

25        Plaintiff contends that Amendment 13 violates the MSA because the formula used to set

26   acceptable biological catch ("ABC") does not appropriately account for known sources of scientific

27   uncertainty.  As this challenge focuses on the application of the ABC rule that was introduced for the

28   first time by Amendment 13, it is timely.

b.     Merits

Plaintiff argues that Amendment 13 fails to comply with the MSA in that the formula the amendment sets for acceptable biological catch fails to account for all known sources of uncertainty. Pl.'s Mot. at 17-20.  Unlike with OY and MSY, there is no explicit statutory provision requiring that FMPs include ABC for the species in the fishery, though the MSA does note ABC as one of the metrics on which a scientific and statistical committee ("SSC") should advise its Council.  16 U.S.C. § 1852(g)(1)(B).  The guidelines interpreting National Standard 1, however, provide that "[f]or stocks and stock complexes required to have an ABC, each Council must establish an ABC control rule based on scientific advice from its SSC."  50 U.S.C. § 600.310(f)(4).  The regulations define ABC as "a level of a stock or stock complex's annual catch that accounts for the scientific uncertainty in the estimate of OFL [overfishing limit] and any other scientific uncertainty."  50 C.F.R. § 600.310(f)(2)(ii).  While ABC may be set as equal to the OFL, it will generally be lower to account for uncertainty and reduce the likelihood of overfishing.  50 C.F.R. § 600.310(f)(3).  The guidelines provide that

> The ABC control rule must articulate how ABC will be set compared to the OFL based on the scientific knowledge about the stock or stock complex and the scientific uncertainty of the estimate of OFL and any other scientific uncertainty.  The ABC control rule should consider uncertainty in factors such as stock assessment results, time lags in updating assessments, the degree of retrospective revision of assessment results, and projections.

50 C.F.R. § 600.310(f)(4).  Further, the ABC control rule must account for uncertainty such that the probability that overfishing will occur "cannot exceed 50 percent and should be a lower value." *Id.*

Amendment 13 provides that ABC for the species in the fishery "is a harvest specification set below the OFL and is a threshold that incorporates a scientific uncertainty buffer against overfishing."  AR 13777.  As discussed above, Amendment 13 sets the following formula for determining ABC for actively managed species in the fishery:

ABC = BIOMASS x BUFFER x FMSY x DISTRIBUTION

AR 13777, 13779.  As OFL for actively managed species is set to equal BIOMASS x FMSY x DISTRIBUTION, the ABC formula amounts to OFL multiplied by the buffer value.  AR 13779. Amendment 13 provides for ABC to be determined periodically:

> The ABC is decided by the Council based on its preferred level of overfishing risk aversion.  The ABC is based on a percentage reduction of the OFL as determined by an SSC determination on scientific uncertainty and a risk policy determined by the Council.  In cases where scientific uncertainty (σ) associated with estimating an OFL is quantified by the SSC, the percentage reduction that defines the scientific uncertainty buffer and the ABC can be determined by translating the estimated σ to a range of probability of overfishing (P*) values.  The Council then determines the preferred level of risk aversion by selecting an appropriate P* value, accordingly.  Each P* value is then matched to its corresponding BUFFER fraction that is applied to the OFL according to the ABC control rule.

AR 13777.  For monitored species, where there is less data available, Amendment 13 provides that ABC will be set at 25% of OFL "until such a time as the SSC recommends an alternate value based on the best available science."  AR 13781.

Plaintiff's challenge, though framed as a challenge to Amendment 13, is actually focused on preliminary reports of the Council's SSC discussing how to determine the buffer value for the ABC control rule.  Pl.'s Mot. at 17-20.  Indeed, Plaintiff's argument does not raise any general objection to the ABC control rule, or cite to Amendment 13 at all.  *Id.*  The crux of Plaintiff's objection is that the SSC, though it acknowledges multiple sources of uncertainty, accounts for only one uncertainty in estimates of the current biomass in its recommendation for setting buffer value for covered species.  AR 4243-44, AR 4257-58.  Plaintiff contends the SSC did not taken in account all known sources of scientific uncertainty in deriving this value.

As the Federal Defendant points out, however, the MSA provides for judicial review only of regulations promulgated by the Secretary, and actions under the regulations that implement a fishery management plan.  16 U.S.C. § 1855(f)(1)-(2).  Plaintiff does not contest the fact that the SSC's report itself is not subject to judicial review.  Pl.'s Reply at 24-25.  Plaintiff does not allege the SSC's report has been adopted and incorporated into a regulation or implemented pursuant the regulations.  While Plaintiff may be able to challenge actions taken to implement Amendment 13 in accordance with the SSC's recommendations, Plaintiff is not alleging that any such action has yet occurred.  Plaintiff's challenge on this issue is thus premature.

Plaintiff argues that the Council should have prescribed that all known sources of uncertainty be accounted for in Amendment 13 but failed to do so.  *Id.*  Plaintiff offers no law, however,

United States District Court

For the Northern District of California

1    establishing that the Council or NMFS must prescribe in advance the accounting of all scientific

2    uncertainty in Amendment 13 itself, rather than setting up a system by which the SSC and the

3    Council would re-assess scientific uncertainty in calculating ABC each year.  Indeed, given that the

4    guidelines discuss setting an "ABC control rule" rather than prescribing a certain ABC in the fishery

5    management plan, Amendment 13's approach in this instance is in line with the intentions of the

6    guidelines.  Thus, the agency's failure to prescribe a more specific buffer value or criteria was not

7    arbitrary and capricious.

8          Additionally, it is not clear that Plaintiff's challenge to the SSC's recommendation would

9    necessarily succeed on the merits.  The SSC acknowledged multiple sources of uncertainty, but it

10   recommended "focus[ing] its attention first and foremost on variation in the estimation of current

11   biomass."  AR 4257-58.  The SSC concluded that uncertainty in estimation of current biomass was

12   the most important source of uncertainty because of large variations in estimates, though it stated

13   that other sources of uncertainty should be incorporated in future management cycles.  AR 4258.

14   The Ninth Circuit has noted that when reviewing MSA plans under the APA, a court's "only task is

15   to determine whether the Secretary has considered the relevant factors and articulated a rational

16   connection between the facts found and the choices made."  *Midwater Trawlers Co-operative v.*

17   *Dep't of Commerce*, 282 F.3d 710, 716 (9th Cir. 2002).  Further, "where, as here, a court reviews an

18   agency action involving primarily issues of fact, and where analysis of the relevant documents

19   requires a high level of technical expertise, we must defer to the informed discretion of the

20   responsible federal agencies."  *Latino Issues Forum v. U.S. E.P.A.*, 558 F.3d 936, 941 (9th Cir.

21   2009) (internal citations and alterations omitted).  Given this deferential standard, it seems doubtful

22   that the SSC's decision to focus first on an area of uncertainty that they found most significant, and

23   to later incorporate other sources of uncertainty, was arbitrary and capricious.

24         Plaintiff does raise one objection that seems at first blush to involve the contents of

25   Amendment 13.  Specifically, Plaintiff points to a concern expressed by the SSC in November 2010,

26   where the SSC noted that the amendment allowed ABC for market squid to be set equal to OFL and

27   stated that "justification or further analysis is required to show why scientific uncertainty does not

28   need to be taken into account when setting the ABC."  AR 16654.  Plaintiff objects that no such

United States District Court

For the Northern District of California

1  justification is provided in the record.  Pl.'s Mot. at 18.  While Plaintiff may be correct on this, the

2  rule allowing ABC for market squid to equal OFL does not seem to have made it into the final

3  version of Amendment 13.  As discussed above, Amendment 13 sets ABC for all monitored species,

4  including market squid, at 25% of OFL.  AR 13781.  Plaintiff's objection on this front is thus

5  without merit.

6       As Plaintiff's challenge to the SSC's recommendations on setting a buffer value for the ABC

7  control rule does not concern a reviewable agency action, Plaintiff's motion for summary judgment

8  is **DENIED** and Defendants' motions for summary judgement are **GRANTED** on this issue.  As

9  noted above, this is without prejudice to challenging agency action taken to *implement* Amendment

10  13 in accordance with the SSC's recommendations.

11       4.    Failure to Use Best Available Science

12       Plaintiff argues that Amendment 13 violates the MSA's requirement to base conservation

13  and management measures on the best scientific information available in two ways.  First, Plaintiff

14  argues that Amendment 13 relies on erroneous data in estimating the percentage of the fish stock

15  that occurs in U.S., rather than Mexican or Canadian, waters.  Second, Plaintiff argues that

16  Amendment 13 relies on an outdated study in basing the harvest rates for the Pacific sardine partially

17  on average ocean surface temperatures.  Both the estimate of fish population in U.S. waters and the

18  equation setting sardine harvest rates are found in Amendment 8 in the same form as they appear in

19  Amendment 13.  *See* AR 13780, 3414-17 (geographical distribution of fish); AR 13780, 3421-24

20  (relationship between ocean temperature and sardine harvest rate).  From the record, it does not

21  appear that the Council gave significant consideration to changing either of these figures.  While

22  Amendment 8 contains an extensive discussion of the research and rationale behind each rule,

23  Amendment 13 contains no discussion of the distribution figure, and only minimal discussion of the

24  equation setting sardine harvest rate.  *Compare* AR 3414-17, 3421-24 *with* 13780.  Discussions of

25  alternatives in the February 2010 draft of Amendment 13, and Amendment 13's Environmental

26  Assessment do not discuss changing either the distribution figure or the formula for setting the

27  sardine harvest rate.  AR 4197-4207, 13588-90.

28

1    There is no indication on the record that the Council or NMFS gave any "serious, substantive

2    reconsideration" of these two rules; hence, the issue has not been reopened, and Plaintiff's challenge

3    on the FMP's compliance with national standard two is untimely.  *P&V Enterprises*, 516 F.3d at

4    1024.  Accordingly, Plaintiff's motion for summary judgment is **DENIED**, and Defendants's

5    motions for summary judgment are **GRANTED** on this issue.

6         5.    <u>Minimum Stock Size Threshold</u>

7         Plaintiff argues that Amendment 13 violates the MSA by failing to set a minimum stock size

8    threshold ("MSST") for species designated as "monitored" rather than "actively managed" under the

9    FMP.  AR 13781-82.  Plaintiff also argues that Amendment 13 sets MSSTs too high for the actively

10    managed species.  AR 13780-81.  Amendment 8, however, also fails to set an MSST for the

11    monitored species, and sets the same MSSTs for the actively managed species as does Amendment

12    13.  AR 3221, 3223.

13         Other than citing to portions of the record indicating that Amendment 13 is generally

14    intended to revise the framework for setting harvest guidelines, Plaintiff points to nothing in the

15    record that suggesting that the Council or NMFS specifically considered revisiting the MSSTs set

16    (or not set) in Amendment 8.  Both the notice in the Federal Register and the introduction to

17    Amendment 13 specifically state that Amendment 13 maintains the default harvest control rules for

18    monitored stocks, though with updated "management reference points." AR 13498, 13748.  Neither

19    specifies what these updated reference points are, and the Amendment does not change MSSTs.

20    Similarly, the Federal Register notice and Amendment 13 introduction provide that harvest control

21    rules for actively managed species will be modified, but only "to include a buffer or reduction in

22    acceptable biological catch . . . to account for scientific uncertainty."  AR 13498, 13748.  Again,

23    there is no mention of MSST.  The Environmental Assessment's discussion of alternatives

24    considered does not discuss MSST.  AR 13588-92.  Finally, the NMFS did not respond to any

25    comments concerning MSST.  AR 13895-96, 13956.

26         The record indicates that neither the Council nor NMFS gave consideration to changing

27    specifying or setting new MSSTs; hence, this issue was not reopened, and Plaintiff's challenge

28

United States District Court

For the Northern District of California

1   thereto is untimely.  Accordingly, Plaintiff's motion for summary judgment is **DENIED**, and

2   Defendants's motions for summary judgment are **GRANTED** on this issue.

3           6.      NMFS' Authority to Disapprove Amendment 13

4           Federal Defendant argues that even if parts of Amendment 13 did not comply with the

5   MSA's requirements, it was not within the Secretary's power to add to or change non-complying

6   parts of Amendment 13. Fed. Def.'s Mot. at 27-28.  While it is true that the Secretary generally may

7   not unilaterally amend aspects of an FMP, she is permitted to disapprove parts of an amendment to

8   the degree that it does not comply with the requirements of the MSA.  16 U.S.C. § 1854(a)(3) ("The

9   Secretary shall approve, disapprove, or partially approve a plan or amendment").  Indeed, Federal

10  Defendant has partially disapproved amendments to the FMP for failure to set certain benchmarks in

11  the past.  For example, the Secretary partially disapproved Amendment 8 to the FMP to the degree

12  that it failed to provide an estimate of MSY for market squid. 64 Fed. Reg. 69888, 69889 (Dec. 15,

13  1999).  Here Plaintiff is arguing not that the Secretary should have amended the FMP herself, but

14  that she should have disapproved Amendment 13 to the degree that portions of the amendment

15  violate the MSA.

16          Federal Defendant also argues that Plaintiff cannot prevail on this claim because agencies

17  have the discretion to prioritize between issues, and that NMFS did not need to address all flaws in

18  the FMP with this amendment.  Fed. Def.'s Mot. at 28-29.

19          While agencies may certainly prioritize in setting which initiatives they wish to pursue, *see*

20  *Associated Gas Distributors v. F.E.R.C.*, 824 F.2d 981, 1039 (D.C. Cir. 1987), here Plaintiff is not

21  alleging that NMFS failed to pursue certain policy agendas; rather, Plaintiff alleges the NMFS

22  approved an amendment to a fishery management plan that was in violation of the MSA.  The MSA

23  explicitly provides that the Secretary has a duty to ensure that FMPs and amendments are

24  "consistent with the national standards, the other provisions of this chapter, and any other applicable

25  law."  16 U.S.C. § 1854(a).  Thus, to the degree and issue was presented or reopened in Amendment

26  13, NMFS had the duty to ensure compliance with the MSA.

27          Accordingly, this Court finds that Federal Defendant's arguments on this front are meritless.

28

**United States District Court**
For the Northern District of California

B.      National Environmental Policy Act

Plaintiff alleges that NMFS violated the National Environmental Policy Act ("NEPA") by failing to perform an Environmental Impact Statement, by improperly deferring environmental review of Amendment 13's impacts, by failing to consider all reasonable alternatives to Amendment 13, and by failing to respond adequately to comments from the public.

NEPA is "our basic national charter for protection of the environment." *Center for Biological Diversity v. United States Forest Serv.*, 349 F.3d 1157 1166 (9th Cir.2003); *see also* 40 C.F.R. § 1500.1 (same). There are two goals underlying the statute: "(1) to ensure that the agency will have detailed information on significant environmental impacts when it makes decisions; and (2) to guarantee that this information will be available to a larger audience." *Neighbors of Cuddy Mt. v. Alexander*, 303 F.3d 1059, 1063 (9th Cir.2002); *see also Earth Island*, 351 F.3d at 1300 ("NEPA requires that a federal agency 'consider every significant aspect of the environmental impact of a proposed action . . . [and] inform the public that it has indeed considered environmental concerns in its decision-making process.'").

"NEPA does not contain substantive environmental standards and guidelines, nor does the Act mandate 'that agencies achieve particular substantive environmental results.' " *Center for Biological Diversity*, 349 F.3d at 1166. Rather, "NEPA imposes procedural requirements designed to force agencies to take a 'hard look' at [the] environmental consequences" of their actions. *Earth Island*, 351 F.3d at 1300. "This includes considering all foreseeable direct and indirect impacts. Further, NEPA requires that an environmental analysis for a single project consider the cumulative impacts of that project together with all past, present and reasonably foreseeable future actions." *Idaho Sporting Cong. v. Rittenhouse*, 305 F.3d 957, 973 (9th Cir. 2002).

1.      Requirement to Prepare Environmental Impact Statement

Plaintiff argues that NMFS violated NEPA because the agency conducted only a more limited Environmental Assessment ("EA") rather than a full Environmental Impact Statement ("EIS"). Defendants argue that because NMFS conducted a proper EA and found that Amendment 13 would not have a significant impact on the environment, NMFS was not required to conduct a full EIS.

NEPA requires that an EIS be prepared for all "major Federal actions significantly affecting the . . . environment." 42 U.S.C. § 4332(2)(C). However, in certain circumstances, *see, e.g.*, 40 C.F.R. § 1501.4 (if an agency's regulations do not categorically require the preparation of an EIS), agencies may first prepare an EA to make a preliminary determination whether the proposed action will have a significant environmental effect. *See Nat'l Parks & Conservation Ass'n v. Babbitt*, 241 F.3d 722, 730 (9th Cir. 2001), *abrogated on other grounds by Monsanto Co. v. Geertson Seed Farms*, 130 S. Ct. 2743, 2757, 177 L. Ed. 2d 461 (2010). "If the EA establishes that the agency's action *may* have a significant effect upon the . . . environment, an EIS must be prepared." *Id.* (emphasis and alteration in original) (internal quotation marks omitted). More specifically,

> an EIS *must* be prepared if substantial questions are raised as to whether a project . . . *may* cause significant degradation to some human environmental factor. To trigger this requirement, a plaintiff need not show that significant effects will in fact occur [;] raising substantially questions whether a project may have a significant effect is sufficient.

*Idaho Sporting Cong. v. Thomas*, 137 F.3d 1146, 1149–50 (9th Cir.1998) (emphasis in original; internal quotation marks omitted), *overruled on other grounds in The Lands Council v. McNair*, 537 F.3d 981, 997 (9th Cir. 2008). If the EA does not establish that the action may have a significant effect, then the agency must issue a Finding of No Significant Impact ("FONSI"), "accompanied by a convincing statement of reasons to explain why a project's impacts are insignificant." *National Parks*, 241 F.3d at 730 (internal quotation marks omitted). "The statement of reasons is crucial to determining whether the agency took a hard look at the potential environmental impact of a project." *Save the Yaak*, 840 F.2d at 717 (internal quotation marks omitted). Thus, a court should defer to an agency's decision only when it is "'fully informed and well-considered.'" *Id.*

Defendant argues that no EIS was required here because, as a matter of law, no EIS or EA is required when a federal action has no negative impact on the physical environment. The Ninth Circuit has held that "an EA or an EIS is not necessary for federal actions that conserve the environment." *Douglas County v. Babbitt*, 48 F.3d 1495, 1505 (9th Cir. 1995); *Pub. Citizen v. Nuclear Regulatory Comm'n*, 573 F.3d 916, 929 (9th Cir. 2009) ("Because Petitioners have identified no effect of the revised DBT rule that may cause significant degradation of some human

United States District Court

For the Northern District of California

1   environmental factor, no EIS was necessary" where petitioners implicitly agreed "that the rule was

2   otherwise only beneficial to the environment").  The *Babbit* court found that the Department of the

3   Interior was not required to conduct an EIS when it designated certain federal lands as critical

4   habitat under the Endangered Species Act because "when a federal agency takes an action that

5   prevents human interference with the environment, it need not prepare an EIS."  48 F.3d at 1505-06.

6   An EIS is thus not required to determine whether the agency, in taking steps to conserve the

7   environment, should have done more.

8        A number of district courts have applied this rule to reject NEPA challenges where

9   challenged actions maintained the status quo or had only beneficial environmental impacts.  In

10  *Prairie Wood Products v. Glickman*, the court found that an EIS was unnecessary for temporary

11  screening rules that prevented logging in certain more vulnerable areas.  971 F. Supp. 457, 467 (D.

12  Or. 1997).  The court found that "it is apparent from the record that [the screening rules] are

13  designed to arrest environmental degradation in order to preserve the environmental status quo."  *Id.*

14  at 468.  The court held that no EIS was required because the rules "were designed and anticipated to

15  conserve the physical environment rather than irretrievably commit resources."  *Id.*  Similarly, the

16  court in *Am. Sand Ass'n v. U.S. Dept. of Interior* found that no EIS was necessary for a Bureau of

17  Land Management decision to temporarily close certain sand dunes to off road vehicles pending an

18  evaluation of the vehicle's effect on endangered species that lived in the dunes.  268 F. Supp. 2d

19  1250, 1253 (S.D. Cal. 2003).

20       In *Pryors Coal. v. Weldon*, the court rejected a NEPA challenge to an agency's plan

21  designating certain roads through wilderness areas as open to some types of motorized use.  803 F.

22  Supp. 2d 1184, 1190-91 (D. Mont. 2011).  One of the roads to which the plaintiffs specifically

23  objected had been designated for motorized use prior to the implementation of the challenged plan.

24  *Id.* at 1191.  The only change the plan made with regards to this road was providing that it should be

25  closed during spring months to protect sensitive soil and vegetation growth.  *Id.*  Though the agency

26  in *Pryors* had conducted an EIS for the plan as a whole, the court specifically relied on *Babbit* in

27  pointing out that the plaintiffs could show no environmental injury with respect to this particular

28  road because the plan had only reduced motorized traffic.  *Id.*

1    Defendant argues that like the cases following *Babbit*, Amendment 13 has no negative

2  impact on the physical environment, because it changed the harvest rules in a way that sets catch

3  levels equal or less than the levels permitted under Amendment 8.  Amendment 13 maintains the

4  general harvest guideline rule for actively managed species set in Amendment 8, but adds a separate

5  rule for setting acceptable biological catch.  *Compare* AR 13779 *with* AR 3220.  The annual catch

6  targets are then set at either HG or ABC, *whichever is lower*.  AR 13779.  Amendment 13 provides

7  that "[i]f the HG, ACL, *or* ACT for the directed fishery is reached the directed fishery will be closed

8  by automatic action . . . ."  AR 13784 (emphasis added).  Thus, actual harvest levels for actively

9  managed species under Amendment 13 may be lower than under previous versions of the FMP, but

10  they may not be higher.  Amendment 13 does not change the harvest control rule for monitored

11  species.  *Compare* AR 3219 *with* AR 13781.

12    Plaintiff argues that Amendment 13 causes a significant impact on the physical environment

13  because it raises the overfishing limit for the Pacific sardine.  Pl.'s Mot. at 28.  While this may be

14  true as a formal matter because Amendment 13 redefines certain terms in the FMP, it does not

15  appear that this will actually result in higher catch levels.  Under Amendment 8, the fishery may be

16  closed when catch levels reach HG.  AR 3225-26.  Under Amendment 13, the fishery is

17  automatically closed if catch levels reach *either* HG, ACL, *or* ACT.  AR 13784.  Of these three,

18  ACL is defined partially in reference to OFL, and ACT is defined as equal to the lesser of HG or

19  ACL.  AR 13779.  Hence, the effect of Amendment 13 is to provide a potentially *lower* limit than

20  the HG (*i.e.*, when the ACL is lower than the HG).  As the definition of HG has not changed from

21  Amendment 8, however, any shift in the OFL definition affecting the ACL cannot actually result in

22  catch levels higher than would have been permitted under Amendment 8.  Additionally, while

23  Amendment 8 allows some discretion as to whether the fishery must close as soon as HG is reached,

24  Amendment 13 *requires* that the fishery close as soon as HG, ACL, or ACT is reached.  Again, this

25  would allow for only the same or lower harvest levels under Amendment 13 than would have been

26  permitted under Amendment 8.

27    Plaintiff argues that NEPA does require an EIS even in situations where an action's only

28  impact on the environment is beneficial.  Plaintiff points to the NEPA regulation interpreting what

United States District Court

For the Northern District of California

1    constitutes a "significant" impact on the environment.  40 C.F.R. § 1508.27.  That regulation notes

2    that determining whether an action significantly impacts the environment requires consideration of

3    both context and intensity.  *Id.*  One of the factors listed for consideration in determining intensity

4    states that agencies should consider "Impacts that may be both beneficial and adverse.  A significant

5    effect may exist even if the Federal agency believes that on balance the effect will be beneficial."

6    *Id.* § 1508.27(b)(1).  This regulation, however, appears to contemplate a federal action with mixed

7    impact – some positive, some negative – that has a net positive effect.  In this case, however,

8    Amendment 13 is not a mixed impact action, but an action that by its very terms has no negative

9    impact at all.

10          Plaintiff cites to no case calling into question the holding of the above cases that an EIS is

11   not required where an action's only impact is to conserve the environment.  While not all of those

12   cases considered this specific provision of the NEPA regulations, they did consider the NEPA

13   regulations more broadly, and noted the requirement under the regulations to conduct an EIS

14   whenever and action may cause significant degradation of the environment.  *See Babbitt*, 48 F.3d at

15   1498; *Pub. Citizen*, 573 F.3d at 928-29.  The court in *Prairie Wood* did quote the regulatory

16   provision that Plaintiff cites here, but it did so in an alternative holding to its holding that an EIS was

17   not required because there was no negative impact on the human environment.  971 F. Supp. at 469

18   (alternative holding that agency's finding of no significant impact was not arbitrary, capricious, or

19   an abuse of discretion) ("assuming [contrary to the court's first alternative holding] the Forest

20   Service was required to assess the effects of actions not involving an irretrievable commitment of

21   forest resources, the record evidences the Forest Service's efforts to analyze the likely effects of both

22   [of the challenged actions], even where the Forest Service may have considered such effects to be

23   beneficial.").  The court there was thus clearly aware of the specific regulatory provision Plaintiff

24   cites, but did not indicate that this regulatory provision calls into question the rule articulated in

25   *Babbit*.

26          Plaintiff offers various arguments about how Amendment 13 causes a significant impact on

27   the environment.  Pl.'s Reply at 27-32.  These arguments, however, do not point to effects caused

28   specifically by Amendment 13 rather than earlier versions of the FMP.  For example, Plaintiff argues

United States District Court
For the Northern District of California

1    that there is a significant impact in part because "Amendment 13 governs allowable catch levels and

2    other measures for five key forage species for years to come." Pl.'s Br. at 28. While it is true that

3    the formulas set in Amendment 13 govern harvest rules for the foreseeable future, this was also true

4    of Amendment 8, and as discussed above, Amendment 13 changes these rules only to make them

5    more conservative.

6           While it is true that an agency must consider cumulative effects of past actions when

7    determining whether to perform an EIS for a current, related project, the Ninth Circuit has held that

8    an agency need not consider cumulative impacts when it has determined that the current action has

9    no incremental impact. *Nw. Envtl. Advocates v. Nat'l Marine Fisheries Serv.*, 460 F.3d 1125, 1140

10   (9th Cir. 2006) ("Because the FSEIS concludes that the channel deepening project will have

11   virtually no effect on salinity, detailed cataloguing of past projects' impact on salinity would not

12   have informed analysis about alternatives presented for the current project, and was unnecessary.")

13   (internal quotation marks omitted).

14          Plaintiff also argues that "even if catch levels do not change substantially [because of

15   Amendment 13], removing forage species from the ocean ecosystem year after year is a significant

16   effect on the physical environment." Pl.'s Reply at 28. This, however, seems more aimed at

17   Plaintiff's argument that NMFS should have prepared a supplemental EIS.

18          2.      Supplemental Environmental Impact Statement

19          In its reply (and not in its opening brief), Plaintiff argues that NMFS was required to

20   examine the ongoing effects of the FMP on the covered species and their ecosystem, particularly in

21   light of new scientific information regarding the importance of the CPS FMP species to the

22   ecosystem. Agencies are required to prepare supplements to earlier EISs where, *inter alia*, "[t]here

23   are significant new circumstances or information relevant to environmental concerns and bearing on

24   the proposed action or its impacts." 40 C.F.R. § 1502.9(c)(1)(ii). Under the APA, a court reviewing

25   an agency's failure to act may "compel agency action unlawfully withheld or unreasonably

26   delayed." 5 U.S.C. § 706(1). A court may only compel actions under this provision of the APA

27   "where a plaintiff asserts that an agency failed to take a *discrete* agency action that it is *required to*

28   *take*." *Norton v. S. Utah Wilderness Alliance*, 542 U.S. 55, 64 (2004) (emphasis in original).

United States District Court

For the Northern District of California

Federal Defendant responds that Plaintiff did not include in its complaint a claim to compel agency action (*i.e.*, the preparation of a supplemental EIS), nor did Plaintiff raise the argument about a supplemental EIS in its initial motion for summary judgment.  Federal Defendant is correct that the complaint's NEPA claim is based on § 706(2) of the APA and seeks to set aside agency action rather than compel agency action under § 706(1).  First Amended Complaint ("FAC") ¶¶ 132-138.  Though the amended complaint does mention the standard for requiring a supplemental EIS in the initial statutory overview for NEPA, it does not reference the need for a supplemental EIS under the facts of this case.  FAC ¶ 49, 90-96, 132, 138.  The facts alleged in support of Plaintiff's NEPA claim focus only on the question of whether NMFS should have conducted a full EIS for Amendment 13.  FAC ¶¶ 90-96.  Though Plaintiff does note that no EA or EIS had been conducted for the FMP since 1998, Plaintiff does not include allegations in the complaint indicating that there was significant new information justifying a supplemental EIS.  FAC ¶ 93.  The Ninth Circuit has held that where "the complaint does not include the necessary factual allegations to state a claim, raising such claim in a summary judgment motion is insufficient to present the claim to the district court."  *Navajo Nation v. U.S. Forest Serv.*, 535 F.3d 1058, 1080 (9th Cir. 2008) (affirming dismissal of NEPA claim that had not been raised in complaint).  Plaintiff's argument that NMFS should have conducted a supplemental EIS is thus not properly before the court.  Even if it were properly pled in the complaint, in the context of the current summary judgment motion, Plaintiff waived the claim by not raising it until its reply.  Moreover, in any event, Plaintiff did not proffer specific evidence establishing that a supplemental EIS was mandated.

3.      Remaining NEPA Arguments

Plaintiff also argues that NMFS improperly deferred consideration of environmental impact of Amendment 13 to the annual process for specifying particular harvest parameters.  For the reasons discussed above, however, it does not appear that NMFS was required to conduct an EIS for Amendment 13, as the amendment did not increase catch levels, and in some circumstances could actually lower catch levels.  Since there was no duty to perform an EIS, NMFS cannot be said to have improperly deferred it.

1    Similarly, Plaintiff's arguments that the EA failed to adequately consider reasonable

2  alternatives or respond to comments are moot given that NMFS was not required to perform an EA

3  at all.

4    As Amendment 13 changes the FMP in such a way that it will have only a neutral or

5  beneficial effect on the environment, NMFS was not required to conduct an EA or EIS under NEPA.

6  Accordingly, Plaintiff's motion for summary judgment is **DENIED** and Defendants' motions for

7  summary judgment are **GRANTED** as to the NEPA claim.

8  C.    Endangered Species Act

9    Plaintiff argues that NMFS violated the Endangered Species Act ("ESA") by failing to

10 initiate a formal consultation regarding the effect that Amendment 13 would have on endangered

11 species that rely on the covered fish stocks for forage.  Pl.'s Mot. at 40-45.  The EA for Amendment

12 13 found that "species listed under the Endangered Species Act are not likely to be affected by the

13 proposed action."  AR 13617.  Similarly, in approving Amendment 13, NMFS determined that

14 "fishing activities pursuant to [Amendment 13] will not affect endangered and threatened species or

15 critical habitat in any manner not considered in prior consultations on this fishery.  Additionally, this

16 action is administrative in that it does not affect the spatial distribution, intensity of fishing activities

17 or other current fishing practices."  AR 13898.

18    The ESA requires that all federal agencies "insure that any action authorized, funded, or

19 carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered

20 species or threatened species or result in the destruction or adverse modification of [critical] habitat

21 of such species."  16 U.S.C. § 1536(a)(2).  When agency action "may affect listed species or critical

22 habitat," the ESA's regulations require that the agency taking action engage in a formal consultation

23 with the appropriate agency responsible for oversight of the affected endangered species, in this

24 case, the Fish and Wildlife Service and the Protected Resources division of NMFS.  50 C.F.R. §

25 402.14.  The Ninth Circuit has recognized that "*Any possible effect, whether beneficial, benign,*

26 *adverse, or of an undetermined character*, triggers the formal consultation requirement."  *Defenders*

27 *of Wildlife v. Flowers*, 414 F.3d 1066, 1072 (9th Cir. 2005) (quoting Federal Register entry

28 promulgating formal consultation regulation) (emphasis in *Flowers*).

United States District Court

For the Northern District of California

Where an agency has already engaged in formal consultation, it must reinstitute consultation "where discretionary Federal involvement or control over the action has been retained or is authorized by law and:

> (a)     If the amount or extent of taking specified in the incidental take statement is exceeded;
>
> (b)     If new information reveals effects of the action that may affect listed species or critical habitat in a manner or to an extent not previously considered;
>
> (c)     If the identified action is subsequently modified in a manner that causes an effect to the listed species or critical habitat that was not considered in the biological opinion; or
>
> (d)     If a new species is listed or critical habitat designated that may be affected by the identified action.

50 C.F.R. § 402.16.

Defendants argue that since NMFS has engaged in formal consultation over the terms of the FMP numerous times in the past, this provision, rather than the one governing initial consultations is provides the appropriate standard. Def.'s Mot. at 30. Plaintiff offers no argument as to why the initial consultation provision of § 402.14 should apply rather than § 402.16.[8] *See* Pl.'s Reply at 37-40. Other courts considering FMPs that have already undergone a formal consultation have analyzed subsequent changes under § 402.16. *See Greenpeace v. Nat'l Marine Fisheries Serv.*, 80 F. Supp. 2d 1137, 1146 (W.D. Wash. 2000) (agency was required to reinstitute formal consultation under § 402.16 because "[s]ince the [previous consultations], significant changes have been made to the fishery management plans and NMFS has concluded the pollock fishery may jeopardize the Steller sea lion."); *Greenpeace Found. v. Daley*, 122 F. Supp. 2d 1110, 1121 (D. Haw. 2000) (addressing question of whether § 402.16 required reinitiation of formal consultation in light of newly available data regarding an endangered species' reliance on lobsters covered by the FMP for

---

[8]  Plaintiff does offer various arguments about the inadequacy of the previous formal consultations under the ESA, particularly with regards to considering the forage needs of predators who rely on species covered by the FMP. Pl.'s Reply at 38-40. The adequacy of the previous consultations, however, is not a part of the instant suit. *See* FAC ¶¶ 139-43 (ESA claim raises only Defendant's failure to perform ESA consultation for Amendment 13).

United States District Court

For the Northern District of California

1   food).  Thus, contrary to Plaintiff's argument, the issue should be analyzed under § 402.16 rather

2   than the standard for initial consultations found in § 402.14.

3          Plaintiff offers no argument as to why NMFS was required to reinstitute an ESA consultation

4   under § 402.16.  The first and final factors triggering a duty to reinstitute ESA consultation clearly

5   do not apply here, as there are no allegations that harvest levels have been exceeded, or that any new

6   species or critical habitats have been designated under the ESA.  Additionally, given that

7   Amendment 13 modifies harvest guidelines in a way that could only maintain or lower the annual

8   catch for CPS FMP species, the plan cannot be said to have been "subsequently modified in a

9   manner that causes an effect to the listed species or critical habitat that was not considered in the

10  biological opinion."  50 C.F.R. § 402.16(c).

11         Though elsewhere in its briefs Plaintiff alleges more generally that new scientific

12  information on the importance of the CPS FMP species as forage for predators has emerged in recent

13  years, these allegations are not sufficient to establish that NMFS was required to reinitiate

14  consultation.  Specifically, Plaintiff's briefs fail to cite to new scientific information indicating that

15  species listed under the ESA are adversely affected by current fishing practices under the CPS FMP

16  in ways not previously considered.  For example, Plaintiff points to a 2009 study that discusses

17  decrease in forage as a factor in the collapse of certain populations of Chinook salmon, but the study

18  mentions decrease in forage only briefly, and attributes the decline in forage populations to ocean

19  conditions rather than overfishing.  AR 14978-150-34, 15003, 15007.  Another article cited by

20  Plaintiff analyzes the ecosystem impact of harvesting forage species and suggests lower fishing

21  levels, but contains no mention of the effect of current practices on endangered species.  AR 14920.

22  *See* Pl.'s Mot. at 26.  Plaintiff has not in its briefing to this Court pointed to information that would

23  indicate that new science "reveals effects of the action that may affect listed species or critical

24  habitat in a manner or to an extent not previously considered."  50 C.F.R. § 402.16(b).  As Plaintiff

25  did not explicitly advance an argument under the relevant regulation, this Court does not express an

26  opinion on whether scientific information exists that would meet this standard.  The Court holds

27  only that no such information has been identified by Plaintiff on this record.

28

1    As Plaintiff has failed to demonstrate that NMFS was required to reinitiate consultation

2  under the ESA, Plaintiff's motion for summary judgment is **DENIED** on this issue, and Defendants'

3  motions for summary judgment on the ESA issue are **GRANTED**.

4                                    **IV.    CONCLUSION**

5    For the foregoing reasons Plaintiff's motion for summary judgement is **GRANTED** as to the

6  question of whether NMFS violated the MSA by failing to set a maximum sustainable yield for the

7  northern subpopulation of the northern anchovy.  Defendant's motions for summary judgment are

8  thus **DENIED** as to this issue, and this aspect of Amendment 13 is remanded to the Secretary for

9  further action consistent with this order.  In all other respects, Plaintiff's motion for summary

10  judgment is **DENIED** and Defendants' motions for summary judgment are **GRANTED.**

11    This order disposes of Docket Nos. 40, 43, and 44.

12

13    IT IS SO ORDERED.

14

15  Dated:  April 12, 2013

16                                                   _____
                                                     EDWARD M. CHEN
17                                                   United States District Judge

18

19

20

21

22

23

24

25

26

27

28

**EXHIBIT A**

| | |
|---|---|
| ABC | Acceptable Biological Catch |
| ACL | Annual Catch Limit |
| ACT | Annual Catch Target |
| AM | Accountability Measures |
| BIOMASS | Estimated biomass of fish 1+ years old |
| BUFFER | Annually set figure that accounts for scientific uncertainty |
| CPS FMP | Coastal Pelegic Species Fishery Management Plan |
| DISTRIBUTION | Estimation of percentage of stock in U.S. waters |
| ESA | Endangered Species Act |
| FMSY | Fishing rate corresponding to MSY |
| HG | Harvest Guideline |
| MSA | Magnuson-Stevens Act |
| MSRA | Magnuson-Stevens Fishery Conservation and Management Reauthorization Act of 2006 |
| MSY | Maximum Sustainable Yield |
| MSST | Minimum Stock Size Threshold |
| NEPA | National Environmental Policy Act |
| NMFS | National Marine Fisheries Service |
| NOAA | National Oceanic and Atmospheric Administration |
| OFL | Overfishing Limit |
| OY | Optimum Yield |
| SSC | Scientific and Statistical Committee |

United States District Court
For the Northern District of California